Chernoff, J.
As Lev Tolstoy aptly observed in the immortal opening lines of Anna Karenina, “All happy families are the same, every unhappy family is unhappy after its own fashion.” The unhappy fashion of the Keating family pits father and daughter against son and vice versa in a lengthy internecine struggle for control of the administration of the family-run closely held food distribution business. The denouement of the son’s involvement was marked by his departure from the family business and his initiation of a competing enterprise. At issue in this jury-waived litigation is, inter alia, whether or not: (1) -the son quit or was fired by his father; (2) the son was “frozen out” of his 49% stock ownership; (3) there was a buy-sell or stock restriction agreement that governs disposition of stock; (4) there was a breach of a fiduciary duty by one or both of them. The Court must also determine whether father and/or son engaged in unfair or deceptive trade practices or committed intentional torts while trying to throttle one another in the competitive marketplace of food distribution to military commissaries.
The trial was conducted in an emotionally charged atmosphere. For more than four weeks, this judge heard multiple versions of the same events from 24 witnesses and viewed 88 document exhibits and a number of demonstrative aids. Some witnesses changed their testimony between deposition and trial and, on occasion, during the trial itself. The resolution of the ultimate controversy involves a number of very close legal calls and their very closeness is reflected in the fashioning of appropriate remedies.
The principal witnesses at trial were the principals in the litigation: the father (Paul M. Keating, Senior, age 70) (“Senior”]; the daughter (Michelle Keating, age 42) (“Michelle”]; and the son (Paul M. Keating, Junior, age 39) (“Junior”]. The Keating family members are blessed with intelligence, a strong work ethic, a keen business sense, and superb organizational skills. However, they are quick-tempered and are not inclined to forgive and forget intra-family slights. The essence of this family tragedy was poignantly expressed by the mother (Bertha Keating, age 69) to her son, Junior, “The whole family is being tom apart... I love you, but this is killing me.”[2]

FINDINGS OF FACT

Some of the facts developed during the multi-week trial are not detailed in these findings because, in retrospect, they turn out to be marginally helpful to the resolution of the issue at bar in that they are probative only of the animosity that fueled the litigation.[3] This judge has elected to set out the relevant facts in chronological chunks.
1965-1988—It all started in the house and garage of Senior, where Alder Food Distributors’ (“Alder”] precursor, Military Sales and Marketing was founded in 1965. Food items were purchased and sold to the military through an outside distributor. The Defense Commissary Agency (“DeCA”] is the military purchaser for the more than two hundred military commissaries located on military bases throughout the world. In 1973, Alder was formed and Military Sales was phased out and exists today only as a shell. In 1988, the sales volume was $2.5 million and in 2003 it will exceed $23 million. Until 1988, the Alder personnel consisted of Senior and a single one-half time employee, Ms. Griffith. By 1988, Senior and his wife Bertha had raised and educated five children, including four daughters and one son, Junior.
1988-1994—Junior graduated from college in 1988 and immediately commenced full-time employment with Alder at Senior’s suggestion. Junior was not a total novice to the business as he had worked part time during college for his father calling on customers and visiting plants. Junior’s focus for the first few years was calling on customers up and down the east coast. In 1990, Alder relocated to Washington Street in Dedham with its personnel complement remaining at 21/2 persons. Junior recognized that DeCA’s change from a manual to an automated system would require automation by Alder. Junior recommended the hiring of a computer software-literate college friend to develop a computer program at Alder. Senior, who showed little interest in the computerization of the business, allowed Junior to proceed with it. Also, Junior helped persuade Senior to gradually do away with the middleman distributor by assuming that function. By 1994, Senior had shifted many important responsibilities for the day-to-day running of the business to Junior. However, clashes in their management styles and personalities were becoming noticeable to outsiders. For example, Junior wanted to expand the company at the sacrifice of cutting profit percentages which grated against Senior’s business philosophy. Also, Senior perceived more than a note of disrespect in Junior’s attitude towards his father and boss. Nevertheless, when Senior passed his sixtieth year, he told Junior that he was planning to turn the business over to him some day. Bertha Keating was concerned that the father/son controversies were having a negative impact on Junior’s health and that work-associated anxiety was causing him chest pains. In 1993, about the time when Junior married, his mother wanted him to join another company.
1994-1997—Alder Food expanded its product line by adding the Bel Kaukauna cheese line from Wisconsin and a Rainbow line was created to handle salmon and swordfish in Europe and the mid-west. In 1994, Senior started to distance himself from the business as he primarily lived in his Florida home and returned to Massachusetts for days at a time about once each month. The business was run on a day-to-day basis *243 by Junior and Joan Stockhammer. Senior began to take estate planning seriously and over the ensuing three years he met periodically, about six to seven times, with his estate planning group which included two financial advisors (Charlie Fellows and Charlie Murphy) and an attorney (Alan Almeida of the firm of Connor & Hilliard, P.C. of Walpole) where Junior attended a substantial number of the meetings. Senior expressed his interest in keeping the control and ownership of Alder Food within the family and the group considered contingencies in the case of Senior’s death and also in case of Junior’s death, divorce, or employment termination. Senior also wanted to insure an income stream to his wife in his absence. There was discussion early on of the issuance and distribution of shares of stock in a manner that would avoid both gift and estate taxes. Even though stock certificates had not yet issued, Junior purchased a $400,000 life insurance policy in October 1995 and Senior purchased a policy for $1,000,000. A number of stock issuance options were discussed over the years including the issuance of stock to a trust. In 1995, an appraisal showed the business worth $700,000 and a conclusion was reached that for gift tax purposes one could discount a minority share by 30% to 35% so that 49% of the stock could be valued at $200,000. In November 1996, Senior was considering drafts of an irrevocable trust to hold 51% of the stock and a second irrevocable trust to hold 49% which would be available to be gifted to Junior.
Although Senior had his differences with Junior and he was not hesitant to criticize Junior’s performance, Senior saw few options and felt that Junior was destined to control and own the business. By early 1997, Senior decided to take the first step towards committing the company to Junior. He decided not to use a trust vehicle and that 100 shares of stock should issue and that Junior would receive 49 of the shares as a gift. The estate planning group spent hours discussing the tax ramifications associated with the shares and the mechanisms for ensuring family ownership of the company, including a stock restriction or buy-sell agreement. Such a restriction may have privately grated against Junior, but he had little bargaining leverage and, according to Attorney Almeida, Junior “nodded” his assent. A death or divorce contingency in a buy-sell agreement might not have irked Junior, but leaving employment at Alder certainly would since Senior was, and would continue to be, resistant to offering Junior a contract with significant tenure terms. In August of 1996, the planning group meeting focused on a discussion of a one-year employment contract for Junior and the position of vice president. An employment agreement was never drafted.
In late 1996 or early 1997, Attorney Almeida produced drafts of stock restriction agreements. There was testimony that the last stock restriction or buy-sell agreement did provide, inter alia, for a payment of $200,000 (with an appreciation provision) to Junior for his stock in the event his employment at Alder was terminated. On April 4, 1997, Senior turned in the initial 100 shares of stock and new certificates issued on that day, 51 shares to Senior and 49 shares to Junior. This Court cannot find that Junior had committed himself to specific terms of a stock restriction or buy-sell agreement when he accepted and signed the stock certificates. Senior may have signed such an agreement and Mr. Almeida may have sent an agreement or the draft of one to Junior, but no one can produce the agreement. Later Junior and his counsel, Attorney Stanzler, made substantial efforts to obtain the document from Attorney Almeida and Attorney Michelmore, Senior’s attorney.
The relationship between Senior and Junior survived highs and lows over this three-year period. In May 1996, Senior, in Junior’s presence, asked Kevin Snyder, a highly regarded consultant at Alder, if he wanted to be made president of Alder Food. The following day Junior complained to Senior who summarily suspended him for one or two weeks stating that it was Senior who ran the company. By letter of May 8, 1996, Senior further chastised Junior, threatening to let him go if he didn’t control his temper and reminding him that his parents had given him, and not his sisters, $40,000 to purchase a house. Yet in 1997 Senior and Junior became jointly involved in two new business ventures, PMK Golf and Keating LLC where the principal asset of the former was a golf driving range and the latter was ownership of the property comprising Alder’s office building and the driving range. In order to facilitate the ventures, Junior received a $5,000 bonus from Alder for each investment and Senior contributed a like amount, probably from his personal funds. Both companies were and remain indebted to Alder Food and it appears that Senior and Junior have maintained equal interests in each company.
By the close of 1997, Senior had turned over the running of Alder Food to Junior and intended his primary interests to be the monitoring of financials and his own compensation as president. Junior hired John Whouley, a childhood friend, as Director of Finance. Junior also hired Rob Dennecke who was a former college roommate.
1998-1999 — Junior was managing the company on a day-to-day basis in the capacity of vice president of sales and marketing. The business expanded from four to more than one dozen product lines including the addition of Land O’Lakes, Integrated Brands, Kens, and Nestle Quick due to the combined efforts of Senior, Junior, Stockhammer, and Denneke. In mid-1998, Michelle Keating was working on the premises of Alder Food managing Military Data Services (“MDS”), which provided pricing and administrative services to manufacturers. MDS was losing money and *244 Michelle accepted Junior’s invitation to join Alder. Michelle learned a great deal from Junior and she served as an intermediary between Senior and Junior when they were unable or unwilling to communicate with each other. Michelle became vice president of marketing while Junior was vice president of sales, a director along with Senior, and clerk. After an interview with both Junior and Michelle, Dustin Whitney, whose wife was friendly with Junior’s wife, was hired by Alder with a $5,000 signing bonus and a two-year non-compete agreement. Greg Sheldon, who knew Whouley’s brother, was hired first as a consultant in 1998 and later as a staff person in January 2000 after interviews with Junior, Michelle, and Senior.
Senior made periodic trips from Florida, examined the books and involved himself in Alder’s affairs when at the office. On one such occasion, in August 1998, Junior and Cathy Flynn were preparing for a presentation in Europe and Senior wanted Junior to make changes in the documents. Junior passed the documents to Senior and told him to make the changes himself. Senior felt publically insulted and, then and there, suspended Junior for two weeks and announced that he would be arrested if he came on the property over that period. During the suspension, Michelle was instrumental in providing Junior with some funds from a related business in the sum of $2,500.
In September 1998, Senior approached Junior with an offer to sell his 51 shares to him for 4 million dollars, payable over ten years, and that he wanted a quick response. Junior discussed the matter with Michelle who indicated that she wanted an ownership share of the business. Junior suggested that she start with a 25% share and she seemed content. Junior felt this to be a fair allocation based on his ten years at Alder and the fact that she had brought in no capital. Attorney Connor, a cousin to the Keatings who was held in very high esteem by all of the principals, was asked to put together a Memorandum of Understanding concerning the sale of Senior’s 51% ownership. Junior, on Connor’s advice, retained an attorney, Mr. Stanzler who, on occasion, met with both Junior and Michelle. Attorney Melinda Kwart, an associate in the Connor law firm, drafted a Memorandum of Understanding. She worked primarily with Michelle who was in contact with both Junior and Senior on it. The price was not included in the agreement and was left as “something to work on.’’ The plan discussed was that Junior and Michelle would gradually buy out Senior. The agreement was never signed. Senior was coming to believe that the most preferable result would be equal ownership interests to Junior and Michelle. Michelle agreed, but Junior felt it unfair and he at least contemplated a side agreement with Michelle.
In 1999, Junior brought in a beverage product line named “Mighty Mouse” which lost approximately $90,000. This loss was not revealed to Senior and was covered by money transferred from accrual accounts from other products. Most of these transactions were known to Michelle. In 1999, Michelle, who was in the final stages of a divorce, became romantically involved with Kevin Snyder. Junior bristled at their public displays of affection and told Michelle that he felt the relationship was inappropriate, could cause problems, and that one of them might have to leave Alder if they were to many. Senior also expressed disapproval of the relationship.
In August 1999, Senior told Junior that he wanted to equalize the inheritance bequests to his five children and, to do so, he needed Junior to release his interests in Keating LLC and PMK Golf to Senior. He presented Junior with release papers which Junior refused to sign or even consider. Senior became infuriated and showed Junior a recent letter from Attorney Michelmore that questioned the viability of the 1997 stock transfer to Junior and said that he would come after those shares. Senior was so outraged that he essentially stopped speaking with Junior from that date to the present. Senior testified that “it was the worst day of his life.” Michelle noticed that Junior was shaken by the incident.
Senior’s bruised feelings contributed to his new resolve to leave the business. At this point, he was basically willing to accept $4,000,000 over ten years and transportation costs over that period as payment for his 51% of the shares. A letter from Junior to Senior dated September 8, 1999, raised a number of questions including tax consequences, payment schedules, Senior’s defined benefit plan, and the status of Rainbow. Senior called upon Attorney Connor to mediate the sale of the business to Junior and Michelle equally. The mediation faced a minefield of fractured feelings and distrust, complex tax snares, and the devilish details. For example, Michelle was present for sessions with the mediator, but Senior and Junior never met together with the mediator because of their refusal to sit in the same room with one another.
As Christmas 1999 approached, Junior came to accept that the purchase of Senior’s 51% for about 4 million dollars would net him but one additional share and 50 shares for Michelle. Junior received a Christmas bonus from Alder. On or about December 23, 1999, Junior received a very welcome letter from Michelle addressed to “Dear Wally,” a pet name which was not embraced by Junior. In the letter she expressed her love, admiration, and gratitude along with an optimism for success in their cooperative undertaking. She wrote that his success should be measured by his own expectations and not that of “ANYONE else,” which might well be a veiled reference to Senior and an appreciation of Junior’s delicate situation. Assuming the sincerity of this letter, it represents the zenith of the sibling relationship which started to unravel within hours.
Michelle attended a Christmas party at Junior’s home with Kevin Snyder and, according to Junior, she *245 drank to excess and embarrassed herself before family and guests. As the month came to a close, Senior, in a decision supported or recommended by Michelle, cancelled Dustin Whitney’s plans for a twelve-day trip to Asia and ordered that Junior go in his stead. Senior said that Whitney would be fired if he went and, in addition, that all bonuses would be held up. Junior unhappily agreed to the order and told Senior by phone that there was no need to make threats.
January 1, 2000-May 2000 — Attorney Connor was nominated by the Governor and confirmed by the Executive Council for a District Court judgeship, and with the New Year, he was phasing out of his law practice at Connor & Hilliard. Accompanied by a letter of January 11, 2000, Mr. Connor transmitted to Junior a proposed agreement that was acceptable to Senior. Mr. Connor stated that he had listened to all three parties and that they have an excellent opportunity for success if they make personal goals and feelings secondary and the interests of Alder first. The Agreement provided for a buyout by Alder of Senior’s 51% for the sum of $500,000 per year for five years and $300,000 per year for the succeeding five years plus reimbursement for automobile travel expenses and air travel over ten years. It further provided that Alder would forgive PMK Golf its $1,058,000 loan and that Junior and Michelle would own Keating LLC while Senior would own PMK Golf. Another Agreement was proposed by Junior which addressed Rainbow, MDS, PMK Golf, and Keating LLC with two alternative payment schemes, one for payment of $3,500,000 over time with $2,500,000 taxed at 21% capital gains and the second for payment of $4,000,000 over time taxed as ordinary income.
Junior left on the Asian trip on or about January 22, 2000. Michelle managed the business in his absence. While in Asia, Junior learned of a developing inventory problem in Germany where perishable products (Coffee-Mate, Lactalis milk, Nestle Quick) which were near their expiration dates had been shipped to Germany and that Alder would have to repurchase the product. In doing so, Alder would sustain a loss of about $20,000 which would be assessed against the products’ accrual accounts which were safely nets or “rainy day funds” put aside from individual product earnings.
Junior returned from Asia on or about January 30, 2000. His relationship with Michelle had seen a downward spiral since Christmas. He resented her Friday absences from the office when she was either tending to her twins or visiting Kevin Snyder in New York. She became very suspicious of Junior’s closed-door meetings with “his” management people Whouley, Sheldon, and Whitney which she saw as a budding conspiracy to exclude and isolate her from corporate management decisions. Senior traveled alone from Florida on or about Saturday February 5th in order to attended the taking of the judicial oath by John Connor which occurred on Februaiy 8, 2000.[4] Michelle arranged for a private breakfast meeting with Senior over his brief visit as he planned to return to Florida following the judicial ceremony. At this meeting, which probably occurred on Sunday, February 6, 2000, Michelle poured her heart out to her father. She told him emphatically that: (1) Junior was not capable of running the company; and (2) Junior was betraying them. She described Junior’s “conspiracy” with his management friends at Alder to exclude her from management. She advised Senior not to sell the company to Junior and her because they would both be betrayed by Junior who would look for a formal mechanism for freezing her out. She said that she feared that he might accomplish this by moving the business of Alder into Rainbow. Senior apparently accepted these representations without hesitation and indicated that the plan to sell his shares to them would be put on hold and that he needed some time to think about what to do about what she had said to him. Senior returned to Florida within a day or two without reaching a decision on how else to respond to Michelle’s accusations of mismanagement and betrayal.
On Friday, February 11, 2000, Michelle was away on personal business. Junior elected to confront Donna Murphy, a regional sales manager, about the mounting losses in Germany which had accrued to thirty thousand dollars. Junior entered the office of Donna Murphy, a veteran employee of 7 years, who was responsible for monitoring the accounts in Germany. It appeared that both she and the independent broker shared responsibility for the problem. Junior expressed anger to her, he shouted obscenities (using the “F word), pounded on the desk, and positioned himself in the room so that she felt physically confined. This meeting lasted about 1½ hours and he had calmed by its end. She offered to come in the following day which was a Saturday and he declined her offer. Nevertheless, the following day, she came to the office with her son and worked for a short time with Junior and Dennecke. The strategy for remediating the problem was to seek some recourse from the broker who shared responsibility. The results of this effort are not known to this Court, although Senior’s position is that accrual funds from this account had previously been inappropriately diverted by Junior to cover and coverup Mighty Mouse losses. On Monday, February 14, 2000, Donna Murphy called in sick with a migraine headache. She stated that she did not want to risk being yelled at. Junior was meeting with DeCA in the Washington, D.C. area when he learned that Donna Murphy had called in sick. He called her at home and offered an apology. Michelle returned to work on Monday and learned of the Donna Murphy incident from staff. Michelle quickly concluded that Junior had acted inappropriately and a phone conversation with him where he minimized the events did nothing to mollify her.
*246 On Tuesday, February 15, 2000, Michelle spoke with Donna Murphy. Ms. Muiphy indicated that she wanted to quit and offered two weeks notice. Michelle convinced her to stay and told her that Junior would be suspended because of his treatment of her. Donna Murphy elected not to resign.[5] Michelle spoke with Senior about the Donna Murphy incident before the close of business on Tuesday and he formalized her resolve that Junior should be suspended. Tuesday evening Junior called Mr. Whouley and learned that Michelle had said that Junior would be suspended for 30 days.
On February 17, 2000, Junior received by FedEx a letter from Senior suspending him with pay for 30 days commencing February 17, 2000. The letter acknowledged his contributions, but stated that he was putting Alder at risk with his abusive management practices. He was instructed to keep away from the business premises, have no contact with the day-today operations and was advised to engage in self-reflection and contemplation.
On February 28, 2000, Junior responded to Senior with a letter stating that what was brought to Senior’s attention was grossly exaggerated, that over the years he had worked well with Donna Murphy, and that he has been a factor in Alder’s growth and prosperity. He closed with a request that Senior call him to discuss moving forward.
On March 7, 2000, Junior sent Senior a memorandum calling for a meeting of the board of directors to discuss, inter alia, “allegations of harassment and the corresponding disciplinary action for all management.”
On March 14, 2000, Senior responded to Junior’s letter of February 28, 2000 noting that Junior had declined to follow his recommendations in that he denied deficiencies in his management style and failed to address his manner of treating employees. Senior placed Junior on an indefinite suspension without pay with a requirement that Junior: (1) participate in a management training course approved by Senior; (2) meet with Senior to improve their working relationship; and (3) meet with Michelle to resolve how to work together in the future. The letter ended with a warning that a refusal on Junior’s part would lead to further disciplinary action including the possibility of termination of his employment.
On March 28, 2000, Junior responded with a memorandum first stating that Senior had failed to attend the Board of Director’s meeting that Junior had scheduled for March 20, 2000. In regards to Senior’s letter of March 14, 2000, he wrote that: (1) Senior should come to Boston to meet with the attorneys on the buy out; (2) a meeting with Michelle should await their working out a direction for the company; (3) that management training would benefit eveiyone there including Michelle, Junior and “possibly” Senior; (4) that there was no management problem at Alder and that he had apologized for the use of language; (5) that the suspensions were hurting company morale; (6) that the company has succeeded under him, citing Michelle’s “Dear Wally letter”; and (7) that he has received no recognition, but instead threats, and suspensions. He closed with a plea for definitive job descriptions and duties to resolve problems between him and Michelle and a declaration that there can only be one leader, not two, and that he would make the best of Senior’s decision.
Shortly after March 28, 2000, probably before March 30, 2000, Senior responded with an undated letter minimizing Junior’s accomplishments, stating that Michelle is not his only source of information at Alder, that Junior’s last communication shows his “unmitigated arrogance” and that Junior has never thanked him for giving him the opportunity to run the company.
On March 31, 2000, Bertha Keating, by e-mail, implored Junior to compromise because his father would not change. Bertha Keating felt that Junior’s employment was still salvageable, but he would have to act immediately to show that he was giving in to his father’s demands. He neither acted immediately nor showed any indication of a desire to make concessions. The Court finds that Senior’s resolve to terminate Junior was firmly set shortly thereafter, probably on April 1, 2000, and no later than April 2, 2000.
On April 2, 2000, after unsuccessfully trying to reach Senior in Florida on previous days, Junior contacted Senior by phone in Weston. Senior refused to discuss the issues but stated that he would offer to buy him out of Alder, PMK Golf, and Keating LLC for $700,000 and he invited a counteroffer.
On or about April 6, 2000, it became known among Alder employees that it was expected that Junior would not be returning to Alder.
On April 13, 2000, Junior sent a letter to Senior stating that he had been wrongfully terminated and effectively removed from the Board of Directors. The letter then presented two buyout options: (1) that Senior could buy out Junior for 5 million dollars for Alder and 1 million dollars for his interest in PMK Golf and Keating LLC; or (2) that Junior could buy out Senior for 5 million dollars plus 1 million dollars to be gifted to Michelle with Senior to own PMK Golf and Junior to own Keating LLC. On this date, Junior also resigned by letter as a director of Alder.
On April 17, 2000, Whouley left Alder Food and joined Elite Food about two months later. Early in Junior’s suspension Whouley was told by Michelle not to communicate with Junior. Junior sent Whouley an e-mail asking him to bring some items including a power report, income statistics, data on Keating LLC, the “Stanzler” file, some papers on his desk, and a Palm Pilot cradle. He claims that he did not take those materials from Alder nor did he delete irretrievable data from computers or transmit any information from *247 Alder computers to anyone. He acknowledges deleting data in his computer, but states that it was retrievable elsewhere in the Alder computer system. This action caused significant inconvenience and an expenditure of time and effort by Alder employees to retrieve the data. Although Whouley’s actions may have been designed in part to make matters inconvenient for Alder, this Court cannot find that he either converted data or destroyed irretrievable data.
On April 21, 2000, Greg Sheldon resigned from Alder with the giving of two weeks notice. Michelle asked that he not help Junior until he left and Sheldon maintains that he honored the request. He testified that he was not a friend of Junior when he was at Alder. In July 2000, Sheldon joined Elite. There is a controversy about a compact disk given to Whouley by Sheldon and whether it contained Alder data from Alder computers. Sheldon, a computer expert, had received a computer from Whouley and he maintains that the CD contained personal data belonging to John Whouley. There is an insufficient basis in the evidence for this Court to find that Whouley prevailed upon Sheldon to convey company data to Whouley.
Weeks earlier, Dustin Whitney was told by Michelle to have no business contact with Junior. Whitney, nevertheless, wrote him aletter about the environment atwork which he claims was a personal letter. On April 24,2000, Dustin Whitney gave two weeks notice and wanted to leave on May 5, but was fired by Michelle on May 1,2000, and escorted from the building. He joined Elite Food almost immediately thereafter.
On April 27, 2000, Junior wrote to Senior that he regretted that Senior would not negotiate concerning Junior’s offer. He complained of Senior’s slandering him and indicated that he remained a 49% shareholder entitled to a full fiduciary accountability and a 50% owner of PMK Golf and Keating LLC.
On April 28, 2000, the Articles of Organization for Elite Food Company were filed with the Secretary of State. Junior embarked on a new career as the sole owner and president of Elite Food Company. The business of Elite appears identical to that of Alder, the sale of food products to military commissaries throughout the world.
Within days of the incorporation of Elite Food, Junior set out to contact some key customers of Alder with the intention of gamering their business. Four of Alder’s accounts left Alder in favor of Elite including Kens, Integrated Brands, Bel Kaukauna, and President’s Cheese. Junior drafted the brokerage arrangement change from Alder to Elite for DeCA. It may be that Alder has lost $500,000 in commissions due to these changes.
Wendell Dukes and Associates was Alder’s broker in the western part of the country and handled Coffee-Mate and other products. Alder, through Michelle and/or Senior, made it clear to Dukes that Dukes could serve Alder or Elite, not both. Dukes chose Alder, one of its largest accounts. Alder claims that it did not want its broker also working for a competitor selling another milk substitute. Alder had made similar exclusivity arrangements with some other brokers over the years. The effect of this action was to compel Elite to use a lesser known and less effective broker out west. It may be that Elite has lost commission opportunities of $500,000 due to these actions.
The story ends with a more recent event where Michelle meets Junior at a trade conference in Norfolk earlier this year and expresses sympathy for the passing of his dog. Junior’s response is to tell her that she is the cause of mining his life. She responds by pouring a glass of wine on him.

Miscellaneous Findings

The defendant has attempted to show that Junior was a very poor manager with an uncontrollable temper who terrorized the staff, causing resignations, that he inappropriately fired good employees and moreover, that he himself would have been fired on several occasions had he not been the owner’s son. Junior has attempted to show that he was a modern effective manager who brought success to the business and near tranquility within. Junior was an effective manager who showed human frailties over the years. His temper and occasional cmdeness was a matter of some concern; however his devotion to the business and its employees merits recognition. The parade of witnesses at trial rated him as “ones” or “tens” over a twelve-year period and this Court need not discuss the views of these polar witnesses.
Likewise, Senior was characterized with the same polar observations. He too is neither a saint nor a sinner and this Court will not detail the incidents described by the competing witnesses.
The evidence shows that Senior and Junior knew how to “push one another’s buttons” and they had no hesitancy to do so, either in public or in private. Sadly, each had no reluctance to demean the other to third persons, sometimes using foul and indiscreet language.
It is also unfortunate that the $30,000 of psychiatric services rendered to Senior and Junior on the sage advice of Attorney/Mediator Connor bore little fruit. The instant dispute from September 1999 to April 2000 is the tip of the iceberg of deep-seated and long-lasting resentments, slights, insults, and lack of expressions of recognition or gratitude.
There was testimony from two financial experts as to the value of Junior’s 49% stock as of April 2000. Junior’s expert concluded that the business is valued at more than $9.6 million and the fair value of Junior’s interest was $4,704,097. This expert did not opine on the fair market value of Junior’s 49% interest because it is Junior’s theory that there was a freezeout of his minority interest that was sufficiently grave that the *248 Court should exercise its equitable powers to award “fair value” rather than a discounted “fair market value.” This expert also declined to make reductions for the volitility of the business and the dependency on retention of staff and management for a service business. The defense expert made substantial deductions for market volitility, dependence on current management, and the traditional discount for the lack of marketability of a minority share in a closed corporation. This expert opined that the value of Junior’s shares is the fair market value which he computes as $800,000.
As set out in the Discussion, this judge finds persuasive the lay testimony of the owners, sellers, and prospective owners of the property as they have peculiar insights and knowledge of the property. In particular, this judge relies on the valuations of Senior, the owner and prospective seller of 51% of the stock, Junior, the owner of 49% and prospective purchaser of 1%, and Michelle, the prospective purchaser of 50%. On all of the evidence and the reasonable inferences to be drawn therefrom, this Court finds that the fair market value of the 49% of the stock owned by Junior as of April 2000 was $1,981,334.

DISCUSSION

The case presented ten issues for the Court which are described as follows:
1. Whether there was an enforceable and complete stock restriction or buy-sell agreement in place at the time of employment termination.
2. Whether Junior was fired before he resigned from the two-person board of directors of Alder Food.
3. Whether the termination of Junior was wrongful under the law.
4. Whether a firing of Junior would breach a fiduciary duty to a minority shareholder and constituted a freezeout.
5. Whether the damages for a freezeout would be the fair market value of the minority shares held by Junior.
6. Whether Junior committed a breach of fiduciary duty to Alder when he started a competing enterprise.
7. The most appropriate method here for assessing the value of minority shares.
8. Whether the actions of Junior in regard to “stealing” Alder customers violated the Massachusetts Consumer Protection Act or constituted tortious conduct.
9. Whether the actions of Senior, Michelle, and Alder in “forcing” a West Coast broker Wendell Dukes to elect not to do business with Elite Foods violated the Massachusetts Consumer Protection Act or constituted tortious conduct.
10. Whether the actions of Whouley concerning the denuding of computers and the downloading of unspecified information constituted actionable torts or statutory wrongs.

1. Existence of cm Enforceable Stock Restriction or Buy-Sell Agreement

Although the parties may have agreed to the concept of a stock restriction or buy-sell agreement, the evidence was insufficient to prove that a binding agreement had been made with specific terms governing compensation for stock in the event of employment termination. The subject matter of a stock restriction agreement was discussed by the parties and other attendees during the periodic estate planning meetings between 1994 and 1997. Such an agreement was contemplated by the parties and was acceptable to Junior if the gift of stock was dependent upon it. It may be that Senior and Junior did not agree to the final terms of an agreement when the time came to transfer the stock. Senior saw fit not to make it a condition precedent and insist on the conveying of the stock shares only upon the execution of a stock restriction agreement. If there was such an agreement, Senior wasn’t thinking of enforcing it when he offered Junior the sum of $700,000 for his shares and invited a counter offer on April 2, 2000.
Assuming, without deciding, that Senior did execute an agreement, the proof fails as to the precise terms of the agreement and whether delivery was in fact made to Junior, and, if so, whether it was reviewed, signed, returned, lost, shredded or disposed of otherwise.
Accordingly, the Court finds that the parties are not bound by either a stock restriction agreement or a buy-sell agreement. Yet, this judge hastens to add that the existence of a buy-sell or stock restriction agreement is not dispositive of the issues in this case. (1) If there was a buy-sell agreement, it would have been trumped by the freezeout. (2) If there was no buy-sell agreement, the freezeout remedy appropriately resolves the issue of compensation for the turnover of Junior’s shares. (3) Lastly, if the Court were to make the buy-sell agreement viable by equitably reforming it, the consideration term added for employment termination would be the fair market value of the shares which happens to be the same remedy awarded for the freezeout. Hence, the result is the same under each of the three scenarios.
2. Termination from Alder Food
The events leading up to Junior’s termination followed the sad pattern of impulsive and questionable decisions by Senior which were followed by self-serving and disrespectful responses by Junior, a chemistry that constantly stirred the pot and led to the inevitable and predictable outcome. No one suggests that anyone spoke the words “I quit” or “You are fired” and hence the Court must rely on more subtle and inferential evidence on what turns out to be a close call.
In March 2000, father, daughter, and son independently concluded that equal control as well as equal *249 ownership by Junior and Michelle guaranteed ongoing strife which would immobilize the business in time. Michelle perceived that Junior would not relinquish control and would isolate her from management decision making. Junior feared that Michelle and Kevin Snyder would become a joint adversary which could threaten his control. Michelle’s mistrust of her brother was so strong that she was willing to give up acquisition of 50% of the stock in order to deprive him of an additional 1%. Over the years, Senior had gone through periods of praising and decrying his son’s management of the business and the ingredient of “betrayal” injected at the February breakfast added a new dimension to his concerns. Like the “Perfect Storm,” all of the irritants[6] descended almost at once on Senior who was overtaken by what he saw as: a challenge to his authority; disrespect, arrogance, and lack of gratitude; mismanagement and misconduct worthy of suspension; sibling betrayal; disruption of the family unit threatening Senior’s own marriage; greed which thwarted Senior’s estate plan to provide for all of his children; and fear for the future of his life’s accomplishment, Alder Food. Senior’s decision was likely supported by Michelle who saw that she could manage Alder in Junior’s absence and feared that Junior’s return would signal years if not a lifetime of on-the-job misery. On all of the evidence and the reasonable inferences to be drawn therefrom, this judge finds that Senior decided that Junior was not returning to Alder Food on April 1, 2000 or, the latest, April 2, 2000. His conversation with Junior on April 2, 2000, tested and reinforced this resolve. Also, his preliminary offer to buy Junior’s shares for $700,000 on April 2, 2000, was a veiled communication to Junior that he was not returning. Although the Court cannot pinpoint the date when Senior and Michelle met with Alder employees and revealed that Junior was not coming back, this information did become known in the corridors of Alder by April 6, 2000. It may be that the formal meeting with Alder employees occurred at the end of April or the beginning of May.
By letter of April 13, 2000, Junior indicated to Senior that he had been wrongfully terminated and Junior submitted his resignation from the two-person board of directors. Junior probably was aware then of the scuttlebutt at Alder Food about his demise.
The Court’s finding that Junior’s employment was terminated by discharge rather than resignation is one of the close issues in this case. Junior’s letter to Senior of March 28, 2000, reminds Senior of Junior’s position that the business should only have one leader for everyday decisions and that it is extremely difficult to have two leaders reporting to Senior. One might see this as an ultimatum, that he must choose between Michelle and him for leader and that if it’s Michelle, then he will go elsewhere, in other words, resign.[7] On all of the evidence, this judge finds that Junior’s “ultimatum” was a minor factor in Senior’s decision to terminate him and that it did not constitute a meaningful offer to resign.
3. Freezeout of the Minority Shareholder by the Majority Shareholder
Junior was an at-will employee and, if not for his shareholder status, he could have been terminated by Senior without cause at any time. Merola v. Exergen, Corp., 423 Mass. 461, 464 (1996). However, his significant ownership share of the company raises issues bearing on employment termination. Id.
As a majority shareholder in a closed corporation, Senior owed a duty of “utmost good faith and loyalty” to the minority shareholder, Junior. Donahue v. Rodd Electrotype Co., 367 Mass. 578, 593 (1975). In Donahue, the Supreme Judicial Court cited numerous possible ways in which the majority might oppress or disadvantage the minority, thereby violating the duty of utmost good faith and loyalty;
The squeezers (those who employ the freeze-out techniques) may refuse to declare dividends; they may drain off the corporation’s earnings in the form of exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives, or in the form of high rent by the corporation for property leased from majority shareholders . . . they may deprive minority shareholders of corporate offices and of employment by the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders ... In particular, the power of the board of directors, controlled by the majority, to declare or withhold dividends and to deny the minority employment is easily converted to a device to disadvantage minority stockholders.
Donahue, 367 Mass, at 588-89. In Donahue the Court dealt with a freezeout in the context of the majority’s refusal to allow the minority to sell its shares back to the corporation at the same price as the majority received. Id. at 598.
One year after Donahue, the Supreme Judicial Court issued the seminal freezeout decision with respect to the majority’s deprivation of employment within the corporation to the minority. In Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842 (1976), the Court observed that “by terminating a minority stockholder’s employment or by severing him from a position as an officer or director, the majority effectively frustrates the minority stockholder’s purposes in entering on the corporate venture and also deny him an equal return on his investment.” Wilkes, 370 Mass, at 850. Specifically, the Court noted that the denial of employment leads to both economic and non-economic consequences for the minority, since: (1) a guarantee of employment may have been one of the basic reasons why a minority owner has invested capital in the firm; (2) the minority stockholder typically depends upon his salary as the principle return on his investment; and (3) denial of employment restricts the minority shareholder’s participation in the management of the enterprise, and he is relegated to enjoying *250 those benefits incident to his status as a stockholder. Id. at 849-50.
Mindful of the possibility that “untempered application of the strict good faith standard enunciated in Donahue will result in the imposition of limitations on legitimate actions by the controlling group in a close corporation which will unduly hamper its éffectiveness in managing the corporation in the best interests of all concerned,” the Court held that the majority can raise a defense to a claim for breach of fiduciary duty by establishing a legitimate business purpose for its action. Wilkes, 370 Mass, at 850-51. “When an asserted business purpose for their action is advanced by the majority, however, we think it is open to minority stockholders to demonstrate that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority’s interest.” Id. at 851-52 (internal citations omitted).
The Wilkes Court concluded that the majority’s decision to remove the plaintiff from the corporation’s payroll and to refuse to reelect him as a salaried officer and director amounted to a freezeout wholly unsupported by any legitimate business purpose. Wilkes, 370 Mass, at 853. Specifically, “(t]here was no showing of misconduct on Wilkes’ part as a director, officer or employee of the corporation which would lead us to approve the majority action as a legitimate response to the disruptive nature of an undesirable individual bent on injuring or destroying the corporation.” Id. Rather, the Court found that the plaintiff minority stockholder “had always accomplished his assigned share of the duties competently, and that he had never indicated an unwillingness to continue to do so.” Id.
The Court cited several factors as bearing on the extent of the duty owed to the plaintiff in Wilkes. First, the Court noted that the stockholders of the defendant corporation had a longstanding policy that each stockholder would be a director of the corporation, and that employment with the corporation would go hand-in-hand with stock ownership. Wilkes, 370 Mass, at 852-53.[8] Additionally, the Court found it significant that the plaintiff was one of the four originators of the corporation, and that he had invested his capital and time for more than fifteen years with the expectation that he could continue to participate in corporate decisions. Id. at 853. The “most important” factor, according to the Court was “the plain fact that the cutting off of Wilkes’ salary, together with the fact that the corporation never declared a dividend assured that Wilkes would receive no return at all from the corporation.” Id.
In Merola v. Exergen, Corp., the Supreme Judicial Court seemed to eschew the Wilkes “legitimate business purpose” test in favor of an inquiry based more on fairness and equity. 423 Mass, at 466. The Court held that even where there was no legitimate business purpose for the termination of the plaintiff minority shareholder, the plaintiff failed to establish a sufficient basis for a breach of fiduciary duty claim because “the termination [was not] for the financial gain of [the majority shareholder] or contrary to established public policy . . . [the plaintiff] was terminated in accordance with his employment contract and fairly compensated for his stock.” Id. Although the Court acknowledged, citing Wilkes, supra, that the termination of a minority shareholder’s employment may present a situation where the majorily has committed a breach of fiduciary duiy, the Court went on to state that “not every discharge of an at-will employee of a close corporation who happens to own stock in the corporation gives rise to a successful breach of fiduciary duty claim.” Id. at 464, 466.
In the wake of the Supreme Judicial Court’s decision in Merola, the proper analytical framework for this Court to employ in passing on the merits of Junior’s freezeout claim is not entirely clear.[9] However, given the facts of this case, it appears that Junior could satisfy either standard. Under the Wilkes analysis, Senior has asserted that by February of 2000, Junior had become a liability to Alder because of the abusive manner in which he treated employees, and that accordingly he had a legitimate business purpose for the actions taken in response to the Donna Murphy incident.
The notion that Junior had somehow become a liability to Alder is not borne out by the weight of the evidence in this case. After Junior took over the day-to-day operations at Alder in 1997, the company experienced steady growth and, of particular concern to Senior, the profit margin remained at an optimal level. To be sure, Junior made certain business decisions that did not work out, particularly with regard to the Mighty Mouse product line. Likewise, at times Junior could be abrasive in his dealings with other Alder employees. However, the evidence in this case indicates that, on the whole, Junior was an effective leader who got along well with his employees, save for a few isolated incidents. Even Donna Murphy, whose confrontation with Junior in February 2000 served as the basis for the actions taken by Senior and Michelle against Junior, testified that most of the time the employees at Alder were happy working under Junior.
As in Wilkes, the actions taken by the majority in this case cannot be condoned as a “legitimate response to the disruptive nature of an undesirable individual bent on injuring or destroying the corporation.” Wilkes, 370 Mass, at 252. To the contrary, Junior routinely carried out his responsibilities at Alder in a competent manner, with the best interests of the corporation in mind. Even after he was placed on suspension in response to the Donna Murphy incident his written correspondence to Senior indicates a willingness to return to Alder, albeit on terms that were ultimately deemed unacceptable by Senior. See id. (minority stockholder had always accomplished his assigned share of the duties competently, and had never indicated an unwillingness to continue to do so).
The key factual distinction between Wilkes and this case is that whereas the plaintiff in Wilkes invested *251 capital in the corporation in exchange for his role as a minority shareholder with input into the managerial decision making process, Junior did not purchase his 49% interest in Alder, but rather it was gifted to him by Senior. Although the issue of whether the lack of a monetary investment in a corporation bars a claim that the minority shareholder has been the victim of a freezeout seems to be one of first impression in Massachusetts, courts in other jurisdictions have held that it does not. See, e.g. In re Smith, 546 N.Y.S.2d 83, 86 (App.Div. 1985) (“[I]t seems clear that the holders of over 41% of a successful corporation are entitled to have their interests protected, regardless of whether or not those shares were received as gifts”); Meiselman v. Meisman, 307 S.E.2d 551, 558-59 (N.C. 1983) (“[W]hen a minority shareholder receives his shares in a close corporation from another in the form of a gift or inheritance, as did plaintiff, here, the minority shareholder never had the opportunity to negotiate for any sort of protection with respect to the ‘reasonable expectations’ he had or hoped to enjoy in the close corporation”).
The circumstances surrounding Senior’s gift of stock to Junior strongly support the conclusion that Junior is entitled to have his 49% interest in Alder protected, notwithstanding the fact that he did not purchase Alder shares. As of 1997, Junior had already been working at Alder for nine years. Junior had been instrumental in implementing a computer system that allowed Alder’s business to continue to grow and he helped phase Alder out of brokering and into distributing. As Senior began to spend the winters in Florida, Junior gradually assumed more of a day-to-day leadership role within the company. The ultimate disposition of the 49% interest was obviously of great importance to Senior as it was the topic of years of estate planning discussion. By the time Senior gifted the shares to Junior in 1997, Junior could reasonably expect that as a 49% shareholder he would receive benefits from Alder in the form of a role in the management decisions within the company as well as a salary. When Senior and Michelle denied Junior of these benefits by their actions in the spring of 2000, they effectively “assured that [he] would receive no return at all from the corporation,” Wilkes, 370 Mass, at 853, thereby freezing him out of Alder.[10]
Junior indicated in a writing to Senior that the business could have only one leader. One could argue that, faced with this ultimatum, Senior, who was personally comfortable with Michelle’s leadership, might well have opted for Michelle over Junior realizing that management by Junior and Michelle or by Junior, Michelle, and Senior was no longer an option.[11] Moreover, Junior had his strengths and weaknesses as a manager, and his performance might have justified a change of leadership, a decision which would likely come under the penumbra of a legitimate business decision. This would have placed the burden on Junior to show that this legitimate objective could have been accomplished through a “less harmful, reasonably practicable, alternative mode of action.” Medical Air Tech, Corp. v. Marwan Inv., Inc., 303 F.3d 11, 20 (2002). This Court finds that Junior could have been assigned different duties and placed in a different position on the organizational chart and also assigned physically to a different location in the central office or elsewhere, near or far. Whether or not that would have been satisfactory over time to Junior is not germane to the Court’s analysis here. If it were a fair and reasonable attempt to deal with the situation in a non-oppressive manner, then there would not have been a breach of Senior’s fiduciary relationship to Junior.
This Court finds that Senior’s discharge of Junior was a breach of his fiduciary duly to the minority shareholder. Junior’s shares netted him neither dividends nor a share in the profits. Since there had never been a board of directors meeting of this two-director company, Junior’s termination by Senior served to disenfranchise and isolate him totally from the company. Being offered by Senior far less than the fair market value for his shares also evidences the resultant freezeout.
4. Measure of Damages for a Freezeout
The parties seem to be in agreement that a court has significant discretion and may exercise a broad range of equity powers in addressing compensation and remediation to a party injured by a fiduciary. Orsi v. Sunshine Art Studios, Inc., 874 F.Sup. 471, 475 (D.Mass. 1995); Demoulas v. Demoulas, 428 Mass. 555, 580 (1998). In many situations the only fair and practical remedy is a court-ordered buyout of the minority shares by the majority. Here, there is no issue of re-hiring the plaintiff. He has moved on to another business venture and the parties in interest could not tolerate being reunited. The only practical remedy is for this judge to order that Senior buy out Junior’s 49% and that Junior release the shares upon payment of the assessed value. Hence, this Court finds that the value of the 49% share is the appropriate measure of damages. The Court must decide whether it is appropriate to compute damages on the basis of the stock’s fair value or its discounted fair market value. As the discount for marketability of a minority interest of a close corporation is often quite substantial, the decision is of some moment. Public policy and equitable considerations based on aggravating and mitigating circumstances drive this difficult decision for this judge who may apply equitable remedies with a “focus on fairness and justice.” Id. Where freezeout conduct is of an exacerbated nature without mitigating factors, then the remedy should include a punitive aspect. Conduct which intentionally inflicts injury on a blameless fiduciary is an example of conduct that warrants no marketability discount. On the other hand, the absence of a mens rea may well warrant consideration of mitigation and the award of compensatory damages which more approximates fair market value damages. Here, when Senior ultimately decided that he could or would no *252 longer tolerate Junior running the business, it is unlikely that he was thinking “freezeout” of a shareholder and a resultant empowerment of his own stock interest. The discharge decision was a highly emotional one without an analysis of the repercussions.
The Court’s freezeout decision is dependent upon the finding that there was a discharge by Senior rather than a resignation by Junior. Aside from the closeness of the freezeout decision, the pathos of the escalating series of events which is marked by blameworthy conduct attributable to both parties, excludes punitive considerations. Hence, the appropriate measure of damages is the fair market value of 49% of the stock. The Court’s ruling mandates that Senior purchase Junior’s shares at the fair market value and that Junior turn over his shares upon receipt of the appropriate sum which, in the form of a judgment, will reflect statutory interest and costs.
5. Significance of a Breach of a Fiduciary Duty by a Minority Shareholder
This Court assumes, without deciding, that a significant minority shareholder of a close corporation has a fiduciary duly to the other shareholders, including the majority shareholder, and that a member of the board of directors has a similar duty to the corporation itself. Senior’s counsel argues that Junior cannot own a substantial portion of the corporation while competing with the corporation. Had Junior resigned from Alder Food in order to compete with it, such conduct might well have violated his fiduciary duly to Alder and Senior, the majority shareholder, especially where, as here, Junior solicited some of Alder’s accounts. However, Junior was terminated under circumstances that warrant a finding that there was a breach of the fiduciary duly to him which preceded any breach by Junior and was significantly more hurtful to him than his injury to Alder and/or Senior. To some extent, one claiming to be injured by a breach of a fiduciary duty ought to have clean hands and the first to strike bears a heavy burden.
Junior was on a suspension without pay status when he was terminated from Alder Food. Senior knew that Junior was basically only employable in the military food distribution business because such was his only employment experience as an adult. Hence, Junior’s establishment of Elite Food could not have come as a surprise to anyone. Lastly, in order for Junior to have purged himself from at least a technical fiduciary breach, he would have had to sell his 49% of Alder in short order where there is no indication that the shares were saleable. Junior’s ownership of 49% over three years earned him no dividends, no say on the board of directors which never met, and no ownership decision making. It is difficult to fathom how his working for a competing business interfered in any meaningful way with his or Senior’s ownership of Alder stock. This judge finds that Junior’s fiduciary duty of utmost good faith and fair dealing to Senior ceased with Junior’s termination on or about April 2,2000 and that his fiduciary duly to Alder as a co-director ceased on April 13, 2000 when he resigned from the board of directors.

6. Assessment of the Buy-Out Value of Plaintiffs Shares

In order to determine the value of 49% of the stock, this Court must determine the value of the entire business at or about the relevant point in time. The plaintiff and the defendant each presented experts who opined on the value of Junior’s shares. Given the adversary process and the contumacious relationship between the parties, it is not surprising that the experts’ opinions are at opposite ends of the spectrum and their calculations leave little leeway for a judge to do anything else but choose one of the polar positions. This judge will resist any attempt to force a “baseball arbitration” fype of result since it would lead to an injustice here. Accordingly, this judge has searched for another modality of assessment and has found a most credible one, that being one based on the opinions of the owner and prospective buyer of the property. These persons were not under a compulsion to buy or sell.
In September of 1999, Senior offered to sell his shares comprising 51 % of the total shares to Junior and Michelle for $4 million payáble over ten years with $500,000 each year for the first five years and $300,000 for the next five yeans in addition to travel expenses over the ten-year period. Junior and Michelle agreed to the financial consideration and an immediate acceptance would have followed had there been an easy resolution to the status of Rainbow Foods and Senior’s profit sharing plan, issues which if resolved would probably not have driven the price substantially one way or the other.
This Court finds that Senior’s asking price for his 51% of the shares was an excellent measure of the value of 51% of the corporation at the time. The Court finds that the travel expenses would have amounted to about $50,000 per year. Therefore, according to the “package,” Senior would have received $4.5 million over ten years. The “present value” of the $4.5 million package at the start of the ten years must reflect a discount for the use of money. Sometimes it is difficult to assess damages with precision and this is such a case. For example, one has to assume that the travel expenses would be incurred equally over the period and paid annually. Also, it is not known whether the parties, in valuing the price, anticipated a deviation from a 5% return on money invested. With the specified payment schedule over ten years, the present value at the time of the sale for 4.5 million dollars was $3,580,217 for 51% of the shares. Hence, 100% of the shares, or the value of the company, computes to $7,020,033.
In valuing the company, neither Junior nor Senior would see a need to factor in a discount for retention of company personnel under the new ownership structure because it would be a reasonable assumption that under the joint ownership of Junior and Michelle, Alder employees would not “jump ship.” Hence, the value of the company to Junior and Senior in the year *253 2000 was $7,020,033. However, an outside buyer would expect a discount where there is no guarantee that at least the “key” men and women would remain in a business that does not rely upon employment term contracts and non-competition contracts[12] or contracts with its customers. Moreover, this service business relies on personal contacts and the credibility and confidence it maintains with its customers on a personal basis. The market value requires that the assessment be made from the vantage point of an outsider and hence this Court discounts the value by 20% for staff and management volatility. Hence, the value of the company with the discount amounts to $5,616,026. An additional discount for market volatility based on uncertainties in dealing with the federal government, which could reorganize commissary purchasing overnight, is not appropriate here because it would have been factored into Senior’s asking price.[13]
The fair value of Junior’s share amounts to 49% which totals $2,751,853. In order to compute the fair market value of Junior’s share, the Court applies a marketability discount of 28% and assesses the fair market value at $1,981,334.

7.Junior’s Post-termination Actions Regarding Clients of Alder

This Court has found that Junior, after being terminated from Alder and frozen out as a shareholder, engaged in conduct that is the subject of the counterclaim, to wit, he contacted and solicited Alder customers and assisted some with the DeCA paperwork necessary for the customer to cancel their relationship with Alder in favor of Junior’s new enterprise, Elite Food. Junior never had a non-compete agreement with Alder nor did the clients have a term contract with Alder. Even though there is no question that Junior’s actions were intended to gain at the expense of Alder, there is no evidence that such conduct was afield in the highly competitive food distribution business. Junior, as a frozen-out minority shareholder, did not breach a fiduciary duty to the majority shareholder or the corporation itself. On the facts proven at trial, this Court cannot find that Junior’s post-termination actions constituted unfair and deceptive trade practices in regards to activities between businesspeople and hence there is no violation of G.L.c. 93A, §11. Likewise, the complained-of conduct did not rise to the level of a tortious interference of Alder’s contractual relationships with the customers. See Kurker v. Hill, 44 Mass.App.Ct. 184, 191 (1998). On these findings, the counterclaims must fail.

8. Alder's and Senior’s Post-termination Conduct Affecting Elite Food

The conduct of Senior, Michelle, and hence Alder in pressuring the West Coast broker to choose between Alder and Elite was forceful and coercive conduct in a highly competitive business market where, according to the evidence, some distributors do insist on exclusivity relationships with some brokers. Elite did establish a relationship with a West Coast broker so that the tactics of Alder did not deprive Elite of doing business. The evidence at trial does not compel a finding that Alder’s conduct constituted an unfair or deceptive trade practice in the businessperson to businessperson competitive world of food distribution to military commissaries. Moreover, the actions did not rise to a level of tortious conduct. Accordingly, these claims must also fail.

9.Legality of the Termination

Junior was an at-will employee and could be terminated from his position without cause. His discharge constituted a freezeout. Even though Senior had an articulable business reason for removing him from the position of vice president in charge of sales, Senior did not seek nor even explore the viability of offering him another position at Alder. The termination led to the freezeout which entitles Junior to the damages discussed above. The Court does not see Senior’s conduct as a wrongful or illegal discharge.[14]

10.The Conduct of John Whouley

On all of the evidence, the Court concludes that Mr. Whouley did not stride to make matters easy for his employer in the waning hours of his employment. He knew that removing information from his computer would put Alder to the task of retrieving it from other sources which constituted a bother under the circumstances. This judge has suspicions that some business records accompanied Mr. Whouley in his final days at Alder, but there is no basis in the evidence for a finding that he took away property that belonged to Alder or which was in any way harmful to Alder. There is a failure in the proof as to the allegations that defendant Whouley misappropriated trade secrets of Alder. Moreover, there is not adequate proof that he inflicted assessable damages on Alder. A decision may not be motivated by conjecture or moral judgments and accordingly the claims against Mr. Whouley have not been proven by a fair preponderance of the evidence.

RULINGS

1. On the Freezeout Claim, the Court finds for plaintiff Paul M. Keating, Junior, and assesses damages at $1,981,334 in that the plaintiff Paul M. Keating, Junior, is ordered to turn in his stock certificates to the Clerk of Court who will hold them until further order of the Court. Paul M. Keating, Senior, is ordered to purchase the shares of Paul M. Keating, Junior, for the sum of $ 1,981,334 plus the statutory interests and costs computed by the Clerk. When the judgment has been paid by Paul M. Keating, Senior, the Clerk, upon consultation with the trial judge will release the share certificates to Paul M. Keating, Senior.
2. On the Chapter 93A Claim against Alder and Paul M. Keating, Senior, the Court finds for the defendants.
*254 3. On the Tortious Interference with Contractual and/or Business Relations Claim, the Court finds for the defendants.
4. On the Breach of an Oral Contract Claim against Paul M. Keating, Senior, and Alder, the Court finds for the defendants.
5. On the Chapter 93A Counterclaim, the Court finds for the defendant-in-counterclaim.
6. On the Tortious Interference with Contractual and/or Business Relations Counterclaims against Paul M. Keating, Junior, the Court finds for the defendant-in-counterclaim.
7. On the Misappropriation of Trade Secrets Counterclaim against Junior, the Court finds for the defendant-in-counterclaim.
8. On the Misappropriation of Trade Secrets Counterclaim claim against Whouley, the Court finds for the defendant-in-counterclaim.
9. On the Breach of a Fiduciaiy Duty Counterclaim against Paul M. Keating, Junior, the Court finds for the defendant-in-counterclaim.
10. On the Breach of a Stock Restriction Agreement Counterclaim against Paul M. Keating, Junior, the Court finds for the defendant-in-counterclaim.

 E-mail correspondence from Bertha Keating in Florida to Junior in Massachusetts on March 31, 2000. (Exhibit 87.)

 For example, several witnesses spend several hours casting aspersions on the principals.

 This date is a matter of public record kept in the Administrative Office of the District Court.

 After Junior’s departure in April 2000, Donna Murphy was promoted to the position of Sales and Distribution Manager and received a very substantial $10,000 pay raise. She resigned two years later on March 13, 2002 after a serious falling out with Michelle who had chastised her over an incident involving spoiled milk to Guantanamo Bay.

 The primary irritants include:
1. Junior rebuffing Senior’s request to give up interest in PMK Golf and Keating LLC to equalize estate shares for his sisters, [“worst day of Senior’s life”)
2. Refusal to speak or meet with one another over seven months 8/99 to 4/00.
3. Junior’s failure to accept the terms of Senior’s generous offer to sell his 51% to Junior 9/8/99.
4. Junior’s attempt to avoid Asia trip by assigning Whitney in his stead, reversed by Senior 1/00.
5. “Betrayal” breakfast with Michelle with accusations of mismanagement and disloyalty 2/6/00.
6. Abusive conduct towards Donna Murphy with resulting 30-day suspension 2/11/00.
7. Junior’s self-serving letter to Senior accepting no blame 2/20/00.
8. Junior calling for board meeting to discuss disciplinary action for “all management" 3/7/00.
9. Junior’s letter promoting self, ignoring Senior’s dictates, seen as “unmitigated gall” 3/28/00.
10.Junior’s ignoring of his mother’s plea to compromise 3/31/00.

 “At best, however, it is extremely difficult to have two leaders running a business with one reporting back to you concerning activities of the other. A final decision has to be made on your part. Regardless of my personal feelings, however, whatever decision you make, I will make the best of it." Conclusion of Junior’s March 28, 2000 memorandum to Senior. [Ex. 69.)

 The facts as set forth by the Court do not shed much light on what constituted the defendant corporation’s “long-standing policy;” i.e. whether the policy was in writing or whether it was simply an understanding amongst the shareholders. The evidence indicates the latter, as the Court stated:
At the time of incorporation it was understood by all of the parties that each would be a director of Springside and each would participate actively in the management and decision making involved in operating the corporation. It was, further, the understanding and intention of all the parties that, corporate resources permitting, each would receive money from the corporation in equal amounts as long as each assumed active and ongoing responsibility for carrying a portion of the burdens necessary to operate the business.
Wilkes, 370 Mass, at 845.

 It should be noted that in one post-Meroiadecision, Judge van Gestel applied the Wilkes “legitimate business purpose” standard in concluding that the plaintiff minority shareholder had been frozen out by the majority shareholders of the defendant corporation. Leslie v. Boston Software Collaborative, Inc., Civil No. 010268BLS (Suffolk Super. Ct. Feb. 12, 2002) (van Gestel, J.) (14 Mass. L. Rptr. 379).

 Even under the standard set forth in Merola, supra, Junior would be entitled to recover under a freezeout theory. Although the actions taken by Senior in the spring of 2000 may not have been for his own financial gain, see Merola, 423 Mass, at 466, it is clear that he benefitted by virtue of the end result. Senior felt that the best thing that could happen would be if Junior retired or went his own way and Michelle took over the company. Unlike the plaintiff in Merola, Junior was never fairly compensated for his stock. Moreover, the Merola Court found that the plaintiffs stock purchase was an investment in the equity of the corporation which was not tied to employment in any formal way, since the plaintiff acknowledged that he could have purchased the shares while he was still only a part-time employee who was also working part-time at another company. Id. at 464. In this case, however, it is doubtful that Senior might have sold shares in Alder, the family business, to someone outside the Keating bloodline, and it is even less likely that he would have sold shares in Alder to someone not employed by Alder. It is therefore evident that Junior’s receipt of stock in 1997 carried with it some connection to future employment within the company.

 This judge does not find this to be the primary reason for discharge, see “2" above.

 The only exception in 35 years is the two-year non-compete contract with Whitney.

 One expert suggested a 35% discount for market and management/staff volatility.

 Even if one did see this as a wrongful discharge, there were no damages proven at trial that flowed from the discharge. Junior immediately commenced another competing business where his income substantially exceeds that which he was earning at Alder. The mitigation would offset damages. Moreover, compensable damages awarded for the freezeout are fair and reasonable compensation for the wrongful conduct.